**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Rudolph JACKSON,**
**Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Larry George DELEVEAUX,**
**Defendant–Appellant.**

Nos. 88–5039, 88–5043.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 31, 1988.

Decided Jan. 3, 1989.

---

William B. Purpura, William H. Klumpp, Jr., Baltimore, Md., (Tracye K. Solove, Solove & Solove, Miami, Fla., on brief), for defendants-appellants.

John Vincent Geise, Asst. U.S. Atty. (Breckinridge L. Willcox, U.S. Atty., Stephen L. Purcell, Asst. U.S. Atty., Washington, D.C., on brief), for plaintiff-appellee.

Before WIDENER, MURNAGHAN and CHAPMAN, Circuit Judges.

WIDENER, Circuit Judge:

Rudolph Jackson and Larry Deleveaux appeal their convictions for possession with intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. § 841(a)(1); and conspiracy to possess with intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. § 846. A number of issues are raised on appeal, and we affirm.

A part of the government's case against Jackson and Deleveaux was the testimony of Harry Payne, a coconspirator who cooperated with authorities and was charged separately. Payne, Deleveaux and Nathaniel Dennis, another coconspirator,[1] worked together as fire fighters in Miami, Florida. Dennis spoke with Payne in May 1986 and asked if he would like to earn some extra money by transporting drugs to the Washington–Baltimore area. Dennis told Payne that Payne would be paid $600 to drive a car to the Baltimore area and then to fly back to Miami. No definite plans were made at that time.

Later that month, Dennis contacted Payne, and they made arrangements for the first trip. Payne and Dennis rented a car with out-of-state tags for the drive north. Dennis then left Payne at Payne's apartment and drove off in the car. Some time later, Dennis called Payne and told him they were going to meet and leave from Dennis' house. When Payne arrived at the house, Deleveaux and Jackson also were there, and the four made the drug run to Baltimore together.

Payne said the men used cocaine before starting the trip. Once on the road, Payne said he and Deleveaux joked about transporting the drugs. When Payne inquired about the cocaine, Dennis told him that it was located under the tire in the trunk and that Payne didn't need to know anything more about the drug activity.

When they arrived in Baltimore, the group drove to a residence on Poe Avenue and Payne was introduced to a man referred to as "Playboy." Payne and Deleveaux went upstairs to shower; Dennis, Jackson and Playboy remained downstairs. Later, the men left the Poe Avenue residence and drove to a home in Oxon Hill, Maryland. There, they were introduced to a man named Smitty and his wife, Erma. Deleveaux and Payne were left in one room while Jackson, Smitty and Dennis went downstairs. The three returned after about 15 to 20 minutes. Later, Smitty drove the men to Washington National Airport in the rental car. Dennis, Deleveaux and Payne flew back to Miami; Jackson remained behind. Dennis paid Payne $600 for the trip, out of which Payne paid his air fare.

Payne described four more similar trips north by car. On the second trip, only Dennis and Payne drove to Baltimore. On the other three trips, only Payne and Deleveaux drove. The routine on each of these trips was similar to, if not the same as, the first. The drivers first would go to the Poe Avenue residence, then to the Oxon Hill home, and then they would fly back to Miami.[2] Payne testified that Jackson accompanied the group north on the first trip and thereafter Jackson met with them when they arrived in Baltimore.

In February or March of 1987, Dennis and Payne discussed the possibility of making the trips by train. Toward the end of the month, Payne agreed to transport the cocaine by train to Baltimore for Dennis. Dennis supplied Payne with the drugs and the telephone number of the Poe Avenue address to call when he arrived in Baltimore. The note read, "Rudy or Playboy 664–8020," to which Payne had added the area code, 301.

When Payne arrived in Baltimore on April 2, 1987, he was detained as he was

---

**1.** Dennis was tried and convicted with Jackson and Deleveaux but his appeal has been continued and is not before the court in this case at this time.

**2.** The third and fifth trips varied. On the third trip Deleveaux and Payne were met by Jackson and Playboy at an exit off Interstate 95. The men then drove around in an attempt to make sure no one was following them before going to the Poe Avenue residence. On the fifth trip the pair went only to the Poe Avenue residence before returning to Miami.

getting off the train by a Baltimore police officer and an Amtrak security officer. Payne was escorted to an interview room where two dogs, trained to sniff out narcotics, inspected his luggage and indicated that Payne was carrying drugs. A package found in Payne's canvas tote bag contained a substance which field-tested positive for cocaine, and Payne was arrested.

Payne agreed to cooperate with the authorities and a plea agreement was executed. The next day, Payne returned to the train station with the agents to attempt to set up a delivery of the cocaine. Their efforts were unsuccessful, but the calls to Playboy and Kesha, Deleveaux's wife, were recorded and later introduced at trial.

Several months later, Dennis, Deleveaux and Jackson were indicted and arrested pursuant to warrants. At the time of Deleveaux's arrest by Drug Enforcement Agent Dombroski, Deleveaux was read his *Miranda* warnings and informed of the statutory violations for which he was being arrested. Deleveaux said he didn't know anything about any cocaine. At this point, Dombroski replied "Just think about Harry Payne." To which Deleveaux responded, "I don't know anything about Harry Payne. I don't know Harry Payne." This false statement was later introduced at trial.

Both Jackson and Deleveaux raise what they claim are numerous errors and seek reversal of their convictions. First, they assert that the Anti–Drug Abuse Act of 1986, under which they were convicted, is unconstitutional for a number of reasons. This court addressed several of the claims raised by these appellants in *United States v. Whitehead,* 849 F.2d 849 (4th Cir.1988), and therefore there is no need to address these claims at length here.

The appellants in *Whitehead* attacked the Act, claiming its minimum sentencing provisions violated their rights to due process and equal protection and the eighth amendment prohibition on cruel and unusual punishment. *Id.* at 851. Jackson and Deleveaux make the same arguments. We rejected these claims in *Whitehead,* and we reject them in this case.

Nor do we find any merit in these appellants' claim that the mandatory minimum sentences violate the separation of powers doctrine. "In our system, so far at least as concerns the federal powers, defining crimes and fixing penalties are legislative, not judicial functions." See *United States v. Evans,* 333 U.S. 483, 486, 68 S.Ct. 634, 636, 92 L.Ed. 823 (1948). Furthermore, any claim that the Act violates the fifth amendment right against self-incrimination by allowing lesser penalties in exchange for cooperation with law enforcement officials is inappropriate here because neither of these appellants cooperated with the officials. Thus, that claim will not be considered on appeal.

Jackson and Deleveaux also contend that the district court erred by admitting hearsay statements into evidence against them. The challenged statements consist of recorded telephone conversations between Payne and Playboy and Payne and Kesha Deleveaux in an attempt to arrange delivery of the cocaine after Payne's arrest. The district court ruled that these conversations were admissible as non-hearsay statements of coconspirators made in the course of and in furtherance of the conspiracy under Rule 801(d)(2)(E) of the Federal Rules of Evidence. See *United States v. Urbanik,* 801 F.2d 692 (4th Cir.1986); *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

Preliminary questions concerning the admissibility of any such evidence must be determined by the court. *Bourjaily* at ——, 107 S.Ct. at 2778–2780. To admit evidence as non-hearsay under Rule 801(d)(2)(E) the moving party must show by a preponderance of independent evidence that 1) a conspiracy existed; 2) that the declarant and the defendant were members of the same conspiracy; and 3) the statement was made in the course of and in furtherance of that conspiracy. See *Urbanik* at 697; *Bourjaily* at ——, 107 S.Ct. at 2779. "The preponderance standard ensures that before admitting evidence, the court will have found it i[s] more likely than not that the technical issues and policy concerns addressed by the Federal

Rules of Evidence have been afforded due consideration." *Bourjaily* at ——, 107 S.Ct. at 2779.

■ The defendants assert that sufficient evidence was not presented to find that either Playboy or Kesha Deleveaux was a member of the conspiracy. The evidence at trial, however, showed that Playboy was present participating in the criminal venture each time Payne made a trip to Baltimore. Also, Deleveaux admitted his wife was aware of his drug activities, even though he did say she did not approve. The government, however, produced a National Car Rental agreement which showed that Kesha Deleveaux later had rented a non-Florida car on February 7, 1987 at the Miami airport. The car was turned in at Washington National Airport the next day, similar to the patterns of the rentals used on the drug courier runs. Based on the government's evidence, we cannot say the court's ruling on the preliminary questions was clearly erroneous, and, thus, the admissibility of the statements must be upheld. See *Bourjaily* at ——, 107 S.Ct. at 2782–2783.

■ Assuming, arguendo, the district court erred in admitting the conversations, any such error would have been harmless. The conversations contain no evidence of any criminal activity on the part of Jackson or Deleveaux and could not have influenced the jury. See *United States v. Tibbetts*, 565 F.2d 867, 868 (4th Cir.1977).

Deleveaux also contends that his false exculpatory statement made to Agent Dombroski should not have been admitted at trial because its use violated his fifth amendment right against self-incrimination. Deleveaux claims the statement was made in response to what amounted to custodial interrogation after he had invoked his right to counsel and had not waived this right. See *Miranda v. Arizona*, 384 U.S. 436, 445, 86 S.Ct. 1602, 1612–1613, 16 L.Ed.2d 694 (1966).

It is not necessary to ascertain whether or not Deleveaux's right to counsel had either been asserted or waived, although he had certainly been advised of it, because we are of opinion that Deleveaux's state-ment was not made in response to police-initiated interrogation. The fifth amendment guarantees the right to have counsel present at any custodial interrogation. *Miranda*, 384 U.S. 471–473, 86 S.Ct. at 1626–1627. Absent such an interrogation, there can be no infringement of this right and no reason to determine whether there had been a valid waiver. *Edwards v. Arizona*, 451 U.S. 477, 485–486, 101 S.Ct. 1880, 1885–1886, 68 L.Ed.2d 378 (1981); see also *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

■ When Deleveaux was arrested, he was informed by the DEA agents of his *Miranda* rights. Deleveaux made no comment on these rights, but, instead, began questioning Agent Dombroski about why he was being arrested. Dombroski told Deleveaux that he was being arrested for violation of 21 U.S.C. §§ 846 and 841(a)(1), distribution of and conspiracy to distribute cocaine. Deleveaux said he didn't understand, that he didn't know anything about any distribution of cocaine. In response to Deleveaux's repeated questioning, Dombroski said to him, "Just think about Harry Payne." Unsolicited, Deleveaux responded, "I don't know anything about Harry Payne. I don't know Harry Payne."

Here, as in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the agent's statement does not rise to the functional equivalent of interrogation. See *Innis* at 302, 100 S.Ct. at 1690. Dombroski's statement was in the form of a declaration, not a question. See *Taylor v. Riddle*, 563 F.2d 133, 135 (4th Cir.1977), cert. denied, 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1977). It came only in response in a conversation which Deleveaux himself initiated, and it should not be construed as an attempt to solicit information from Deleveaux. See *United States v. Peoples*, 748 F.2d 934 (4th Cir.1984), cert. denied, 471 U.S. 1067, 105 S.Ct. 2143, 85 L.Ed.2d 500 (1985). We believe, therefore, that Deleveaux's statement was admissible as a spontaneous comment voluntarily made after being fully informed of his fifth amendment rights. Nothing in the record supports the proposition that Dombroski

knew or should have known that his brief response to Deleveaux would result in Deleveaux's false denial of knowledge. *Innis*, 446 U.S. 302–303, 100 S.Ct. at 1690–1691.

Finally, both Jackson and Deleveaux assert that the district court erred in denying their motions for judgments of acquittal because of insufficiency of the evidence at trial. The verdict of a jury must be upheld if there is substantial evidence, taking the view most favorable to the government, to support that finding of guilt. *United States v. Jones*, 735 F.2d 785, 790 (4th Cir.1984), cert. denied, 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984). "[T]he relevant question is not whether the appellate court is convinced of guilt beyond a reasonable doubt, but rather whether, viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." *United States v. MacDougall*, 790 F.2d 1135, 1151 (4th Cir.1986).

■ We believe the government presented sufficient evidence against both Jackson and Deleveaux to sustain their convictions. As to Jackson, the evidence is that he was present on the first trip by car to Baltimore and that he assisted the drug couriers upon their arrival in Baltimore on subsequent trips. It was during the first trip that Dennis, in the presence of Jackson, told Payne that the cocaine was hidden in the trunk of the car. Jackson also participated in the meetings with Dennis and Playboy in Baltimore after the cocaine arrived by car.

■ Deleveaux also was present on the first trip when Dennis told Payne the cocaine was hidden in the trunk of the car. Payne testified that he and Deleveaux joked about transporting the cocaine. Deleveaux also was present on the third, fourth and fifth trips by car to Baltimore. Furthermore, Deleveaux acknowledged his awareness of the cocaine activity, when he and Payne discussed his wife's feelings about his illegal activities.

■ Jackson and Deleveaux criticize the evidence presented by the government as being entirely circumstantial, but circumstantial evidence is treated no differently than direct evidence, and may be sufficient to support a guilty verdict even though it does not exclude every reasonable hypothesis consistent with innocence. *United States v. George*, 568 F.2d 1064, 1069 (4th Cir.1978).

Accordingly, the convictions are

AFFIRMED.